Schuyler G. Carroll
PERKINS COIE LLP
30 Rockefeller Plaza, 22nd Floor
New York, New York 10112
Tel: (212) 262-6900
Fax: (212) 977-1649
SCarroll@perkinscoie.com

*Attorneys for Lake Avenue Capital, LLC*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------- X
In re:                                :   Chapter 7
                                      :
DIRECT ACCESS GROUP LLC,              :
                                      :   Case No.: 13-11780 (ALG)
                    Debtor.           :
                                      :
------------------------------------- X

### DECLARATION OF ROBERT ENSLEIN, JR.

I, Robert Enslein, Jr., declare as follows:

1. I am the Managing Member of Lake Avenue Capital, LLC ("Lake Avenue"). I submit this Declaration in support of the Emergency Motion of Lake Avenue Capital LLC Pursuant to Sections 303(g), 303(h) and 701 of the Bankruptcy Code, Federal Rules of Bankruptcy Procedure 1011(b), 1013(a), 2001(a) and 9006, and Local Rules 9006-1 and 9013-1 for an Order: (a) Appointing an Interim Chapter 7 Trustee; (b) Shortening the Alleged Debtor's Time to Answer the Petition; and (c) Shortening the Time for a Hearing on the Petition for an Order or Relief.

**A.    The Loan**

2. On December 28, 2011, Direct Access Group LLC ("Alleged Debtor") and Lake Avenue entered into a Loan Agreement, pursuant to which Lake Avenue loaned Alleged Debtor $2.5 million for a term of three years at a 3% interest rate. A copy of the Loan Agreement is

attached as <u>Exhibit A</u>. The Loan Agreement required annual payments of accrued interest. After December 31, 2012, either party could call the entire loan due and payable on 90-days' notice.

3. The Loan Agreement specifically directed that the loan proceeds were to be transferred to Alleged Debtor's wholly-owned subsidiary, Direct Access Partners LLC ("Partners"), for use in its broker-dealer business. As a FINRA-member broker-dealer, Partners was required to maintain a certain level of assets relative to its trading positions. The Loan Agreement required any excess cash above such minimum levels to be transferred back to Alleged Debtor for payment on the Loan.

4. The Loan Agreement was signed by myself on behalf of Lake Avenue and Benito Chinea ("Chinea"), as Managing Member of Alleged Debtor. Chinea is also listed as an advisor with Partners.

**B.    The Letter of Intent**

5. In connection with the Loan Agreement, Alleged Debtor and Lake Avenue entered into a Letter of Intent ("LOI"). A copy of the LOI is attached as <u>Exhibit B</u>. The LOI acknowledged the $2.5 million Loan from Lake Avenue to Alleged Debtor that was to be transferred to Partners as "additional paid in capital."

6. The LOI further provided that Lake Avenue would receive a 40% interest in Class C shares and 20% interest in Class D shares of Alleged Debtor. The Class C shares were to include the net profits of Partners' service bureau ("Service Bureau"), while the Class D share were to include the net profits of Partners' minority-backed investment advisor division, Khandaker Direct, LLC ("KD"). Distributions on account of the Class C and Class D shares were to occur annually unless otherwise agreed by the parties.

7.   The LOI provided that I would be hired as President and Chief Operating Officer of Service Bureau and KD and paid $20,000 per month plus participation in a performance-based bonus pool.

8.   The LOI was signed by Chinea on behalf of Alleged Debtor, but was printed on Partners letterhead, expressly confirming the agreement of both Alleged Debtor and Partners.

**C.   Misrepresentations to Lake Avenue**

9.   As an enticement for Lake Avenue to make the Loan, Chinea made numerous representations regarding the Alleged Debtor and Partners' business.

10.  For instance, Chinea represented to Lake Avenue that Appaloosa Management, a large, well-known hedge fund, was making a $150 million investment in a newly formed seed management platform with Partners, in which Lake Avenue would share in the profits.

11.  Chinea also represented to Lake Avenue that Partners had just over $7.5 million in capital and needed the $2.5 million Loan from Lake Avenue before the end of 2011 to surpass the $10 million capital requirement that would allow Partners to obtain significant additional business from companies seeking to trade with minority-backed brokerage firms.  Chinea also told Lake Avenue that it had recently hired a specialist in St. Louis that would help further Partners' minority-backed business.

12.  Chinea further represented that KD was a registered investment advisor and that KD was an asset of Partners.

13.  None of these representations, or the representations in the LOI, were ever true. Alleged Debtor never provided the new operating agreements contemplated by the LOI (despite repeated requests), Appaloosa Management never made an investment in any of Alleged Debtors' or Partners' assets or funds as per Chinea's representation and I was never hired by KD.

14. Additionally, KD did not have an active license to conduct business as a registered investment advisor and no effort was made to get one, which eliminated all value from Lake Avenue's 20% interest in the Class D shares of Alleged Debtor.

15. Further, Partners never provided the resources for, or formed, the Service Bureau, which eliminated all value from Lake Avenue's 40% interest in the Class C shares of Alleged Debtor.

**D.    Alleged Debtor Defaults On The Loan And The Loan Agreement**

16. Alleged Debtor failed to make any interest payments on the Loan when due under the Loan Agreement. Accordingly, on February 25, 2013, Lake Avenue exercised its right to call the entire amount of the Loan due within 90 days. A copy of Lake Avenue's notice is attached as Exhibit C.

17. Alleged Debtor has failed to make any repayment on the Loan. In May, 2013, Alleged Debtor informed Lake Avenue that Alleged Debtor had no intention or ability to repay the Loan until Partners' wind down and liquidation is complete.

18. In January 2012, Partners formed a new asset management affiliate, headed by Donald Motschwiller.

**E.    The Federal Government Alleges Massive Fraud at Partners**

19. Just a few weeks ago, on May 3, 2013, federal law enforcement authorities arrested two senior employees at the Miami office of Partners on various charges relating to a massive fraud within the global markets division of Partners involving tens of millions of dollars.

20. On May 7, 2013, the United States Attorney filed a criminal complaint against the Partners' employees in the United States District Court for the Southern District of New York

(Case No. 13 MAG 0683), alleging of the Corrupt Foreign Practices Act, Travel Act and money laundering.  A copy of the criminal complaint is attached as <u>Exhibit D</u>.

21.　　On the same day, the Securities and Exchange Commission filed a civil action in the United States District Court for the Southern District of New York (Case No. 13-CV-3074) against the Partners' employees and others, alleging that, beginning in October, 2008, the global markets division of Partners engaged in an illegal kick-back scheme to generate over $66 million in transaction fees by fraudulently marking-up and marking-down riskless trades of state-sponsored bonds for the Venezuelan bank, Banco de Desarrollo Economico y Social de Venezuela.  A copy of the civil complaint is attached as <u>Exhibit E</u>.

22.　　The SEC alleges that traders at Partners perpetrated the fraudulent scheme by deceiving its clearing brokers, executing internal wash trades, inter-positioning another broker-dealer in trades to conceal Partners' role in the transactions, engaged in massive roundtrip trades to pad their revenue, and using offshore accounts and a shadow accounting system to conceal the illegal profits and bribes.

23.　　As a result of the criminal and SEC enforcement actions, Partners abruptly discontinued all operations.  *See* May 20, 2013 letter from Wael Sobhy of Partners, a copy of which is attached as <u>Exhibit F</u>.

24.　　It is unclear at this time who is in control of Alleged Debtor or Partners or the status of their assets, but in light of the alleged criminal and fraudulent activity that has continued for quite some time, I believe that an independent fiduciary is urgently needed to prevent further wrongful conduct and facilitate an orderly wind down and liquidation.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: May 28, 2013

_____
Robert Enslein, Jr.
Managing Member
Lake Avenue Capital, LLC