# Exhibit D

Approved:    _____    **13 MAG 0683**
             HARRY A. CHERNOFF
             JASON H. COWLEY
             Assistant United States Attorneys

Before:      THE HONORABLE RONALD L. ELLIS
             United States Magistrate Judge
             Southern District of New York

- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA        :    SEALED
                                     COMPLAINT
             -v-                :
                                     Violations of
TOMAS ALBERTO CLARKE            :    18 U.S.C. § 371
BETHANCOURT,                         15 U.S.C. § 78dd-2
JOSE ALEJANDRO HURTADO, and    :    18 U.S.C. § 1952(a)(3)(A)
MARIA DE LOS ANGELES GONZALEZ        18 U.S.C. § 1956(a)(2)(A)
DE HERNANDEZ, a/k/a "Maria De :     18 U.S.C. § 1956(h)
Los Angeles Gonzalez,"               18 U.S.C. § 2
a/k/a "Mary,"                  :

             Defendants.        :

- - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

        LILIAN PEREZ, being duly sworn, deposes and says that
she is a Special Agent with the Federal Bureau of Investigation
and charges as follows:

## COUNT ONE
### (Conspiracy To Violate the Foreign Corrupt Practices Act)

        1.    From at least in or around December 2008 through
in or around October 2010, in the Southern District of New York
and elsewhere, TOMAS ALBERTO CLARKE BETHANCOURT (hereinafter
"TOMAS CLARKE"), and JOSE ALEJANDRO HURTADO (hereinafter
"ALEJANDRO HURTADO"), the defendants, and others known and
unknown, willfully and knowingly did combine, conspire,
confederate and agree together and with each other to commit an
offense against the United States, to wit, violations of the
Foreign Corrupt Practices Act (the "FCPA"), Title 15, United
States Code, Section 78dd-2.

        2.    It was a part and object of the conspiracy that
TOMAS CLARKE and ALEJANDRO HURTADO, the defendants, and others
known and unknown, being citizens, nationals, and residents of

the United States and officers, directors, employees, and agents
of "domestic concerns," as that term is defined in the FCPA, and
stockholders thereof acting on behalf of such "domestic
concerns," would and did make use of the mails and means and
instrumentalities of interstate commerce corruptly in furtherance
of an offer, payment, promise to pay, and authorization of the
payment of moneys, offers, gifts, promises to give, and
authorizations of the giving of things of value to foreign
officials, and to any person, while knowing that the money or
thing of value will be offered, given, or promised to a foreign
official, for purposes of (a) influencing acts and decisions of
such foreign officials in their official capacity, (b) inducing
such foreign officials to do and omit to do acts in violation of
the lawful duty of such officials, (c) securing an improper
advantage, and (d) inducing such foreign officials to use their
influence with a foreign government, and agencies and
instrumentalities thereof, to affect and influence acts and
decisions of such foreign government, and agencies and
instrumentalities thereof, in order to assist TOMAS CLARKE and
ALEJANDRO HURTADO and others known and unknown in obtaining and
retaining business for and with, and directing business to, any
person, in violation of Title 15, United States Code, Section
78dd-2.

## Overt Acts

3.    In furtherance of the conspiracy and to effect the
illegal object thereof, the following overt acts, among others,
were committed in the Southern District of New York and
elsewhere:

a.    On or about May 21, 2009, ALEJANDRO HURTADO,
the defendant, emailed MARIA DE LOS ANGELES GONZALEZ DE
HERNANDEZ, a/k/a "Maria De Los Angeles Gonzalez" a/k/a "Mary"
(hereinafter, "MARIA GONZALEZ"), a foreign official in Venezuela,
a spreadsheet of bond transactions and associated commissions.
This spreadsheet, which related to transactions occurring in May
2009, reflected that 50% of the commissions were for "MdAG,"
which are GONZALEZ's initials, for a total amount of $509,250.

b.    On or about July 13, 2009, HURTADO received
instructions in an email from GONZALEZ directing him to wire
certain funds to an account in Switzerland held in the name of an
associate of GONZALEZ ("Associate 1").

c.    On or about July 21, 2009, acting upon the
instructions described above, HURTADO caused to be wired
approximately $509,250 from an account in the United States that

-2-

had received funds from a particular broker-dealer (the "Broker-Dealer") in New York, New York, to a correspondent account maintained in New York, New York, for further transfer to an account in Switzerland held in the name of Associate 1.

        d.    On or about September 29, 2009, the Broker-Dealer in New York sent a wire transfer of approximately $2,002,983 to an account held by a Panamanian company, ETC Investments SA,[1] in Switzerland and controlled by TOMAS CLARKE, the defendant.

        e.    On or about January 28, 2010, CLARKE caused his employer, the Broker-Dealer, to purchase and sell certain bonds.

        f.    On or about April 19, 2010, CLARKE caused to be wired approximately $883,488 from an ETC Investments account in Switzerland holding funds that had been received from the Broker-Dealer in New York, New York, to an account in Switzerland held by a company owned jointly by GONZALEZ and Associate 1.

        g.    On or about May 6, 2010, CLARKE caused to be wired approximately $700,000 from an ETC Investments account in Switzerland that had received funds from the Broker-Dealer in New York, New York, to an account in Switzerland held by a company owned jointly by GONZALEZ and Associate 1.

        (Title 18, United States Code, Section 371.)

<u>COUNT TWO</u>
(Violation of the Foreign Corrupt Practices Act)

    4.    On or about July 21, 2009, in the Southern District of New York and elsewhere, ALEJANDRO HURTADO, the defendant, being a citizen, national, and resident of the United States and therefore a "domestic concern," as that term is defined in the FCPA, and an officer, director, employee, and agent of a "domestic concern," and a stockholder thereof acting on behalf of such "domestic concern," made use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of offers, payments, promises to pay, and authorizations of the payment of any money, and offers, gifts, promises to give, and authorizations of the giving of things of

---

    [1] This entity was also referred to as "ETC Investment, Inc." and "ETC Investment SA." For purposes of this Complaint, this entity is referred to as "ETC Investments."

value to foreign officials, and to any person, while knowing that
the money or thing of value will be offered, given, or promised
to a foreign official, for purposes of (a) influencing acts and
decisions of such foreign officials in their official capacities,
(b) inducing such foreign officials to do and omit to do acts in
violation of the lawful duty of such officials, (c) securing an
improper advantage, and (d) inducing such foreign officials to
use their influence with a foreign government, and agencies and
instrumentalities thereof, to affect and influence acts and
decisions of such foreign government, and agencies and
instrumentalities thereof, in order to assist HURTADO in
obtaining and retaining business for and with, and directing
business to, any person, to wit, HURTADO used the means and
instrumentalities of interstate commerce to wire a payment at the
direction of MARIA GONZALEZ, a foreign official in Venezuela, of
approximately $509,250 to an account held in the name of
Associate 1, in order to obtain and retain trading business
directed by GONZALEZ on behalf of a Venezuelan state-owned and
state-controlled economic development bank to the Broker-Dealer,
with which HURTADO was affiliated.

(Title 15, United States Code, Section 78dd-2, and
Title 18, United States Code, Section 2.)

## COUNT THREE
(Violation of the Foreign Corrupt Practices Act)

5.   Between on or about May 18 and on or about June 4,
2010, in the Southern District of New York and elsewhere, TOMAS
CLARKE, the defendant, being a citizen, resident, and national of
the United States and therefore a "domestic concern," as that
term is defined in the FCPA, and an officer, director, employee,
and agent of a "domestic concern," and a stockholder thereof
acting on behalf of such "domestic concern," made use of the
mails and means and instrumentalities of interstate commerce
corruptly in furtherance of offers, payments, promises to pay,
and authorizations of the payment of any money, and offers,
gifts, promises to give, and authorizations of the giving of
things of value to foreign officials, and to any person, while
knowing that the money or thing of value will be offered, given,
or promised to a foreign official, for purposes of (a)
influencing acts and decisions of such foreign officials in their
official capacities, (b) inducing such foreign officials to do
and omit to do acts in violation of the lawful duty of such
officials, (c) securing an improper advantage, and (d) inducing
such foreign officials to use their influence with a foreign
government, and agencies and instrumentalities thereof, to affect
and influence acts and decisions of such foreign government, and

-4-

agencies and instrumentalities thereof, in order to assist CLARKE
in obtaining and retaining business for and with, and directing
business to, any person, to wit, CLARKE, acting as an
intermediary, caused certain funds to be sent from the Broker-
Dealer in New York, New York to MARIA GONZALEZ, a foreign
official in Venezuela, in order to obtain and retain trading
business directed by GONZALEZ on behalf of a Venezuelan state-
owned and state-controlled economic development bank to the
Broker-Dealer.

(Title 15, United States Code, Section 78dd-2, and
Title 18, United States Code, Section 2.)

## COUNT FOUR
### (Conspiracy To Violate the Travel Act)

6.    From at least in or around December 2008 through
in or around October 2010, in the Southern District of New York
and elsewhere, TOMAS CLARKE, ALEJANDRO HURTADO, and MARIA
GONZALEZ, the defendants, and others known and unknown, willfully
and knowingly did combine, conspire, confederate and agree
together and with each other to commit an offense against the
United States, to wit, violation of the Travel Act, Title 18,
United States Code, Section 1952(a)(3)(A).

7.    It was a further part and object of the conspiracy
that TOMAS CLARKE, ALEJANDRO HURTADO, and MARIA GONZALEZ, the
defendants, and others known and unknown, unlawfully, willfully,
and knowingly, would and did travel in interstate and foreign
commerce and use the mail and facilities in interstate and
foreign commerce, with intent to otherwise promote, manage,
establish, carry on, and facilitate the promotion, management,
establishment, and carrying on of unlawful activities, namely,
(a) violations of the anti-bribery provisions of the FCPA, Title
15, United States Code, Section 78dd-2, (b) commercial bribery,
in violation of New York State Penal Law Section 180.00 and (c)
commercial bribe receiving, in violation of New York State Penal
Law Section 180.05; and thereafter would and did perform and
attempt to perform acts to otherwise promote, manage, establish,
carry on, and facilitate the promotion, management,
establishment, and carrying on, of such unlawful activity, in
violation of Title 18, United States Code, Section 1952(a)(3)(A).

### Overt Acts

8.    In furtherance of the conspiracy and to effect the
illegal object thereof, the following overt acts, among others,

-5-

were committed in the Southern District of New York and
elsewhere:

a.   On or about May 21, 2009, ALEJANDRO HURTADO,
the defendant, emailed MARIA GONZALEZ, the defendant, a
spreadsheet of bond transactions and associated commissions.
This spreadsheet, which related to transactions occurring in May
2009, reflected that 50% of the commissions were for "MdAG,"
which are GONZALEZ's initials, for a total amount of $509,250.

b.   On or about July 13, 2009, HURTADO received
instructions in an email from GONZALEZ directing him to wire
funds to an account in Switzerland held in the name of Associate
1.

c.   On or about July 21, 2009, acting upon the
instructions described above, HURTADO caused to be wired
approximately $509,250 from an account in the United States that
had received funds from the Broker-Dealer to a correspondent
account maintained in New York, New York, for further transfer to
an account in Switzerland held in the name of Associate 1.

d.   On or about September 29, 2009, the
Broker-Dealer in New York sent a wire transfer of approximately
$2,002,983 to an account held by ETC Investments in Switzerland
and controlled by TOMAS CLARKE, the defendant.

e.   On or about January 28, 2010, CLARKE caused
his employer, the Broker-Dealer, to purchase and sell certain
bonds.

f.   On or about April 19, 2010, CLARKE caused to
be wired approximately $883,488 from an ETC Investments account
in Switzerland that had received funds from the Broker-Dealer in
New York, New York, to an account in Switzerland held by a
company owned jointly by GONZALEZ and Associate 1.

g.   On or about May 6, 2010, CLARKE caused to be
wired approximately $700,000 from an ETC Investments account in
Switzerland that had received funds from the Broker-Dealer in New
York, New York, to an account in Switzerland held by a company
owned jointly by GONZALEZ and Associate 1.

(Title 18, United States Code, Section 371.)

## COUNT FIVE
(Violation of the Travel Act)

9.    On or about July 21, 2009, in the Southern District
of New York and elsewhere, ALEJANDRO HURTADO and MARIA GONZALEZ,
the defendants, unlawfully, willfully, and knowingly, would and
did travel in interstate and foreign commerce and use the mails
and facilities in interstate commerce, with intent to otherwise
promote, manage, establish, carry on, and facilitate the
promotion, management, establishment, and carrying on of unlawful
activity, namely, (a) violations of the anti-bribery provisions
of the FCPA, Title 15, United States Code, Section 78dd-2, (b)
commercial bribery, in violation of New York State Penal Law
Section 180.00, and (c) commercial bribe receiving, in violation
of New York State Penal Law Section 180.05; and thereafter would
and did perform and attempt to perform acts to otherwise promote,
manage, establish, carry on, and facilitate the promotion,
management, establishment, and carrying on, of such unlawful
activity, in violation of Title 18, United States Code, Section
1952(a)(3)(A), to wit, HURTADO used facilities in interstate
commerce to wire a payment at the direction of GONZALEZ, a
foreign official in Venezuela, of approximately $509,250 to an
account held in the name of an associate of GONZALEZ, in order to
obtain and retain trading business directed by GONZALEZ on behalf
of a Venezuelan state-owned and state-controlled economic
development bank to the Broker-Dealer, with which HURTADO was
affiliated.

(Title 18, United States Code, Sections 1952 and 2.)

## COUNT SIX
(Violation of the Travel Act)

10.    Between on or about May 18 and June 4, 2010, in
the Southern District of New York and elsewhere, TOMAS CLARKE,
the defendant, unlawfully, willfully, and knowingly, would and
did travel in interstate and foreign commerce and use the mails
and facilities in interstate commerce, with intent to otherwise
promote, manage, establish, carry on, and facilitate the
promotion, management, establishment, and carrying on of unlawful
activity, namely, (a) violations of the anti-bribery provisions
of the FCPA, Title 15, United States Code, Section 78dd-2, (b)
commercial bribery, in violation of New York State Penal Law
Section 180.00, and (c) commercial bribe receiving, in violation
of New York State Penal Law Section 180.05; and thereafter would
and did perform and attempt to perform acts to otherwise promote,
manage, establish, carry on, and facilitate the promotion,
management, establishment, and carrying on, of such unlawful

-7-

activity, in violation of Title 18, United States Code, Section
1952(a)(3)(A), to wit, CLARKE, acting as an intermediary, caused
certain funds to be sent from the Broker-Dealer in New York, New
York to MARIA GONZALEZ, a foreign official in Venezuela, in order
to obtain and retain trading business directed by GONZALEZ on
behalf of a Venezuelan state-owned and state-controlled economic
development bank to the Broker-Dealer.

(Title 18, United States Code, Sections 1952 and 2.)

### COUNT SEVEN
(Conspiracy To Commit Money Laundering)

11.   From at least in or around December 2008 through
in or around October 2010, in the Southern District of New York
and elsewhere, TOMAS CLARKE, ALEJANDRO HURTADO, and MARIA
GONZALEZ, the defendants, and others known and unknown, willfully
and knowingly did combine, conspire, confederate, and agree
together and with each other to violate Title 18, United States
Code, Section 1956.

12.   It was a part and an object of said conspiracy
that ALEJANDRO HURTADO, TOMAS CLARKE, and MARIA GONZALEZ, the
defendants, and others known and unknown, would and did
transport, transmit and transfer funds from a place in the United
States to and through a place outside the United States and to a
place in the United States from and through a place outside the
United States, with the intent to promote the carrying on of
specified unlawful activity, that is, (1) violations of the FCPA,
Title 15, United States Code, Section 78dd-2, and (2) violations
of the Travel Act, Title 18, United States Code, Section
1952(a)(3)(A).

(Title 18, United States Code, Sections 1956(h))

### COUNT EIGHT
(Money Laundering)

13.   On or about July 21, 2009, in the Southern
District of New York and elsewhere, ALEJANDRO HURTADO and MARIA
GONZALEZ, the defendants, in an offense involving and affecting
interstate and foreign commerce, unlawfully, willfully, and
knowingly would and did transport, transmit, and transfer, and
attempt to transport, transmit, and transfer, monetary
instruments and funds from a place in the United States to and
through a place outside the United States and to a place in the
United States from and through a place outside the United States,
with the intent to promote the carrying on of specified unlawful

-8-

activity, that is, (1) violations of the FCPA, Title 15, United
States Code, Section 78dd-2, and (2) violations of the Travel
Act, Title 18, United States Code, Section 1952(a)(3)(A); to wit,
HURTADO and GONZALEZ caused approximately $509,250 to be wire
transferred from the United States to Switzerland, to carry on
the bribery scheme described more fully below.

   (Title 18, United States Code, Sections 1956(a)(2)(A) and 2.)

<u>COUNT NINE</u>
(Money Laundering)

   14.   Between in or about May 18 and June 4, 2010, in
the Southern District of New York and elsewhere, TOMAS CLARKE,
the defendant, in an offense involving and affecting interstate
and foreign commerce, unlawfully, willfully, and knowingly would
and did transport, transmit, and transfer, and attempt to
transport, transmit, and transfer, monetary instruments and funds
from a place inside the United States to and through a place
outside the United States and to a place in the United States
from and through a place outside the United States, with the
intent to promote the carrying on of specified unlawful activity,
that is, (1) violations of the FCPA, Title 15, United States
Code, Section 78dd-2, and (2) violations of the Travel Act, Title
18, United States Code, Section 1952(a)(3)(A); to wit, CLARKE,
acting as an intermediary, caused certain funds to be sent from
the Broker-Dealer in New York, New York to an account in
Switzerland controlled by MARIA GONZALEZ, to carry on the bribery
scheme described more fully below.

   (Title 18, United States Code, Sections 1956(a)(2)(A) and 2.)

   The bases for my knowledge and for the foregoing
charges are, in part, as follows:

   15.   I am a Special Agent with the Federal Bureau of
Investigation ("FBI").   I have been an FBI Special Agent for
approximately 7 years, and I have personally participated in the
investigation described herein.   This affidavit is based upon my
conversations with others, including other law enforcement
agents, and my examination of reports and records.   Because this
affidavit is being submitted for the limited purpose of
establishing probable cause, it does not include all the facts
that I have learned during the course of my investigation.   Where
the contents of documents and the actions, statements and
conversations of others are reported herein, they are reported in
substance and in part, except where otherwise indicated.

-9-

## RELEVANT ENTITIES AND THE DEFENDANTS

16.   At all times relevant to this Complaint, Banco de
Desarrollo Económico y Social de Venezuela ("BANDES"), the
state-owned and state-controlled economic development bank of the
Bolivarian Republic of Venezuela, operated under the direction of
the Venezuelan People's Ministry of Planning and Finance.   BANDES
acted as the financial agent of the Venezuelan government in
order to promote economic and social development, serve as the
trustee for agencies of the public sector, and support the
expansion and diversification of Venezuela's infrastructure.

17.   At all times relevant to this Complaint, the
"Broker-Dealer" was a brokerage firm registered with the U.S.
Securities and Exchange Commission (the "SEC") and with its
principal place of business in New York, New York.   The Broker-
Dealer maintained desks at the New York and American Stock
Exchanges and had offices in New York, New York, as well as
Miami, Florida.

18.   Since approximately June 2008, and at all times
relevant to this Complaint, MARIA GONZALEZ, the defendant, served
as either the Vice President of Finance or Executive Manager of
Finance and Funds Administration of BANDES.   As such, GONZALEZ
was a "foreign official" as that term is defined by the FCPA.   In
these capacities, GONZALEZ oversaw BANDES's trading abroad,
including trading by the Broker-Dealer on behalf of BANDES.
GONZALEZ was listed by the Broker-Dealer as the authorized
trading contact for BANDES.

19.   Beginning in or around late 2008, TOMAS CLARKE,
the defendant, was an employee of the Broker-Dealer based in
Miami, Florida.   CLARKE served as a Senior Vice President in the
Global Markets Group of the Broker-Dealer.   CLARKE was listed as
the Broker-Dealer's account opening salesman for the BANDES
account.

20.   Beginning in or about July 2009, ALEJANDRO
HURTADO, the defendant, was an employee of the Broker-Dealer
based in Miami, Florida.   Prior to that, beginning in or around
January 2009, HURTADO's spouse ("Hurtado's Spouse") was
affiliated with the Broker-Dealer as a foreign finder.[2]

---

[2] The Financial Industry Regulatory Authority ("FINRA") has
promulgated rules permitting compensation to be paid to non-
registered "foreign finders" based on the business they direct to
a registered broker-dealer if certain conditions are met.

According to payroll records, in 2010, HURTADO's first full year
of employment at the Broker-Dealer, HURTADO was one of the
highest compensated employees at the Broker-Dealer, receiving
approximately $4,384,616 in salary and bonus.

## OVERVIEW OF THE BRIBERY SCHEME

21.   Based on the information set forth herein, there
is probable cause to believe that TOMAS CLARKE and ALEJANDRO
HURTADO, the defendants, and others known and unknown, directed
kickback payments to MARIA GONZALEZ, the defendant, in exchange
for GONZALEZ steering BANDES business to the Broker-Dealer and
authorizing BANDES to execute bond trades with the Broker-Dealer.
As set forth below, between at least in or around December 2008
and October 2010, GONZALEZ received at least $3.6 million in
payments through insiders and affiliates of the Broker-Dealer.
The payments to GONZALEZ represented a portion of the monies
generated by the Broker-Dealer's bond trading activity in
connection with BANDES.   During this time period, with GONZALEZ
both acting as the authorized trading contact in regard to the
Broker-Dealer and managing the relationship between BANDES and
the Broker-Dealer, BANDES directed substantial business to the
Broker-Dealer and carried out bond transactions that resulted in
the Broker-Dealer generating tens of millions of dollars in
revenue.

22.   As part of the scheme, ALEJANDRO HURTADO, the
defendant, and Hurtado's Spouse received millions of dollars from
the Broker-Dealer in the form of salary, bonus payments, and
finders fees, that were generated from the Broker-Dealer's mark-
ups and mark-downs in connection with the securities it bought
from and sold to BANDES.   HURTADO, in turn, conveyed a portion of
these funds back to MARIA GONZALEZ, the defendant.   Also as part
of this scheme, millions of dollars generated from BANDES-related
mark-ups and mark-downs were sent from the Broker-Dealer to a
foreign entity controlled by CLARKE, with a portion of these
funds being further transferred to an entity owned jointly by
GONZALEZ and Associate 1 (the "Gonzalez Company").

23.   In order to promote this bribery scheme, TOMAS
CLARKE and ALEJANDRO HURTADO, the defendants, along with others
known and unknown, conspired to transmit and transmitted funds,
constituting kickback payments, from accounts inside the United
States to accounts outside of the United States.   These accounts
outside of the United States were controlled by, among others,
GONZALEZ, Associate 1, and the Gonzalez Company.   I believe that
GONZALEZ, CLARKE, and HURTADO used middlemen and intermediary
corporate entities to route these payments to GONZALEZ in order

-11-

to conceal these kickback payments.

## OVERVIEW OF THE BROKER-DEALER'S WORK FOR BANDES

24.   Starting in or around 2008, the Broker-Dealer
established a group within the Broker-Dealer known as the Global
Markets Group ("GMG").   The GMG primarily served institutional
clients by providing fixed income trading services in the
purchase and sale of foreign sovereign debt.

25.   The GMG would, at a customer's direction, locate a
bond the customer wished to purchase, purchase that bond, and
then resell it to the customer at a higher price.   The Broker-
Dealer would retain this "mark-up."   Conversely, when selling a
bond on behalf of a customer, the Broker-Dealer would purchase
the bond from the customer at a below-market price and then sell
that bond on the market for a higher price.   The Broker-Dealer
would retain this "mark-down."

26.   In November 2010, the SEC commenced a periodic
examination of the Broker-Dealer.   From November 2010 through
March 2011, the SEC's staff made several visits to the firm's
offices in New York, New York, to conduct the examination; the
SEC's final contact with the firm in connection with conducting
the examination was in or about July 2011.

## GONZALEZ MANAGED THE RELATIONSHIP WITH THE BROKER-DEALER
## ON BEHALF OF BANDES

27.   I have reviewed documents, including documents
that the SEC obtained from the Broker-Dealer, reflecting that
MARIA GONZALEZ, the defendant, managed the relationship between
the Broker-Dealer and BANDES and authorized the Broker-Dealer to
execute trades on behalf of BANDES.   For example:

a.   I have reviewed documents indicating that
GONZALEZ had served as the Vice President of Finance or as the
Executive Manager of Finance and Funds Administration of BANDES
since approximately June 2008.

b.   I have reviewed Broker-Dealer documents that
identify GONZALEZ as BANDES's "Authorized Trading Contact" for
the Broker-Dealer.   Another BANDES employee is listed as the
"Primary Trading Contact."

c.   I have reviewed an email GONZALEZ sent on or
about June 4, 2009, to ALEJANDRO HURTADO, the defendant, with the

-12-

subject (translated from Spanish):[3] "Bonds." The email stated
(translated from Spanish): "Hello! Enclosed please find the
portfolio that you are going to negotiate for the Vnzl-27; it has
to be valued on a daily basis to see if we can come out ahead.
It's in your hands." On or about June 5, 2009, the following
day, HURTADO forwarded this email to TOMAS CLARKE, the defendant,
and another employee of the Broker-Dealer. When forwarding the
email from GONZALEZ, HURTADO stated in his own email (translated
from Spanish):

> Good Morning, Guys,
>
> Here you have more work (thank God).
>
> We can start right away, so let's talk before starting.
>
> A big hug.
>
> AH

   d.   I have reviewed an email HURTADO sent on or
about October 20, 2010, to GONZALEZ attaching a spreadsheet
setting forth possible bond transactions that the Broker-Dealer
could execute for BANDES. HURTADO's email stated, in part
(translated from Spanish): "Please look it over, like I said it
could be fast and very efficient. If you look it over you will
be able to see how great it would be to do it."

### BANDES TRANSACTIONS GENERATED SUBSTANTIAL REVENUE
### FOR THE BROKER-DEALER

   28.   Based in part upon my review of documents obtained
from the Broker-Dealer, I have learned that between in or around
April 2009 through in or around June 2010, the overwhelming
majority of revenue generated by the GMG resulted from the
execution of bond trades for BANDES. During this time period,
the Broker-Dealer generated over $60 million in revenue from
BANDES trading in fixed income investments, including Venezuelan
bonds.

   29.   Based in part upon my review of documents obtained
from the Broker-Dealer and trading records I have reviewed, I

---

  [3] Translations of emails written in Spanish were prepared by
a translator who has certified that she is competent to conduct
such translations and further certified under penalty of perjury
that the translations are true and correct.

have also learned of specific securities transactions that the
Broker-Dealer carried out with BANDES that generated substantial
revenue for the Broker-Dealer in the form of mark-ups, including
the following:

a.    In or around late January 2010, TOMAS CLARKE,
the defendant, caused the Broker-Dealer to execute at least two
trades between the Broker-Dealer and BANDES for the same bonds on
the same day.   In other words, BANDES sold certain bonds and then
shortly thereafter purchased back those same bonds.   The result
of such trades was that BANDES was left with the same bond
holdings as before the trades, except that it had paid the
Broker-Dealer approximately $10.5 million in mark-ups in the
course of the two round-trip transactions.   Specifically:

i.    First, on or about January 28, 2010,
CLARKE caused the Broker-Dealer to purchase from BANDES bonds
issued by a Venezuelan state-owned electric utility ("ELECAR")
for approximately $90,673,000.   CLARKE on behalf of the Broker-
Dealer then, on that same day, sold these same ELECAR bonds back
to BANDES for approximately $95,953,000, resulting in a mark-up
paid to the Broker-Dealer of approximately $5,280,000.

ii.   Second, on or about January 29, 2010,
the Broker-Dealer purchased from BANDES a number of ELECAR bonds
for approximately $90,017,014.   On or about the same day, the
Broker-Dealer then sold these same ELECAR bonds back to BANDES
for approximately $95,257,014, resulting in a mark-up paid to the
Broker-Dealer of approximately $5,240,000.

b.    As described more fully below, I have
reviewed documents obtained from the Broker-Dealer indicating
that roughly half of the approximately $10.5 million in revenue
generated by these mark-ups was designated to be paid as
kickbacks to GONZALEZ.

### GONZALEZ RECEIVED KICKBACK PAYMENTS FROM BROKER-DEALER EMPLOYEES AND AFFILIATES BASED ON TRADES EXECUTED BY THE BROKER-DEALER FOR BANDES

30.    Based in part upon my review of documents obtained
from the Broker-Dealer, financial records, and emails obtained
during the course of the investigation, I have learned, in
substance and in part, the following:

a.    As set forth further below, between at least
in or around May 2009 through in or around August 2010, MARIA
GONZALEZ, the defendant, both personally and through the Gonzalez

-14-

Company, received kickback payments from employees of the Broker-
Dealer and other individuals associated with the Broker-Dealer,
including TOMAS CLARKE and ALEJANDRO HURTADO, the defendants.
These kickbacks were derived from revenue the Broker-Dealer
generated from BANDES through executing trades for BANDES.

      b.    GONZALEZ arranged for payments to be made to
herself, in part, through payments directed to the Gonzalez
Company and her co-owner of the Gonzalez Company, Associate 1.
These payments were made or directed by, among others, CLARKE and
HURTADO, who both worked in the Miami, Florida office of the
Broker-Dealer.  In turn, CLARKE and HURTADO used intermediaries,
including corporate entities, to convey these payments to
GONZALEZ.

### Email Correspondence Regarding Payments to GONZALEZ

      31.  I have reviewed emails obtained from the
Broker-Dealer that reflect certain payments to be paid to MARIA
GONZALEZ, the defendant.  These emails include the following:

      a.    On or about February 8, 2010, TOMAS CLARKE,
the defendant, sent from his personal Bloomberg email account an
email to ALEJANDRO HURTADO, the defendant, at HURTADO's Broker-
Dealer email account, attaching a document with the file name
"alejandro y economista mes de feb.xlsx" (translated from
Spanish: "alejandro and the [female] economist month of Feb.")
that contained several spreadsheets.

      i.  One of the spreadsheets contained rows of
bond trades and columns reflecting commissions, in addition to
the trading prices.

      ii.  Next to the commissions column were two
additional columns, entitled "Mary" and "Miami/[Acronym for
Broker-Dealer]" in which the commissions were split into two
amounts for each trade.

      iii.  This entire spreadsheet, which is
entitled "Economista 2," reflected $5,302,231 in commissions to
"[Acronym for Broker-Dealer]/Miami" and $5,260,439 in commissions
to "Mary."  The amount of kickback commissions allocated to
"Mary" - $5,260,439 - included the commissions generated from the
late-January 2010 ELECAR transactions described above.

      b.    On or about April 9, 2010, CLARKE sent from
his Broker-Dealer email account an email to a Gmail account used
by HURTADO (the "HURTADO Gmail Account").  Attached to the email

-15-

was a document with the file name "alejandro y economista mes de
mar.xlsx" (translated from Spanish: "alejandro and the [female]
economist month of March") that contained several spreadsheets.

    i.  One of the spreadsheets contained rows of
bond trades and columns reflecting, in addition to the trading
prices, commissions.

    ii. Next to the commissions column were two
columns, entitled "Comisiones" and "Mary" in which the number
listed as the commissions was divided in half and entered in the
"Mary" column.

    iii.  This spreadsheet, which was also
entitled "Economista 2," reflected $107,985 in commissions to
"Mary."

    c.   On or about May 25, 2010, CLARKE sent from
his Broker-Dealer account an email to HURTADO at the Hurtado
Gmail Account attaching a document with the file name "alejandro
y economista mes de Mayo 2010.xlsx" (translated from Spanish:
"alejandro and the [female] economist month of May 2010") that
contained several spreadsheets.

    i.   One of the spreadsheets contained rows
of bond trades and columns reflecting, in addition to the trading
prices, commissions.

    ii.  Next to the commissions column were two
columns, entitled "Comisiones" and "Mary" in which the number
listed as the commissions was divided in half and entered in the
"Mary" column.  This spreadsheet, which was also entitled
"Economista 2," reflected $108,500 in commissions to "Mary."

    32.  I have reviewed email correspondence obtained
through search warrants indicating that ALEJANDRO HURTADO, the
defendant, sent MARIA GONZALEZ, the defendant, spreadsheets
setting forth BANDES bond trades with the Broker-Dealer, trading
prices, and payments to be made to GONZALEZ.  These emails
include the following:

    a.   On or about May 21, 2009, HURTADO sent from
the Hurtado Gmail Account an email to GONZALEZ at a Yahoo account
used by GONZALEZ (the "Gonzalez Yahoo Account"), with a "cc" to
another co-conspirator ("CC-1").  The subject line stated "cuadro
final abril" (translated from Spanish:  "final april graph").
The email stated (translated from Spanish):

-16-

Dear Sirs,

I am sending you here the final graph for April

Greetings

Alejandro Hurtado
[address and phone number]

Attached to the email was a spreadsheet entitled "MdAG Abril
2009.xls" (translated from Spanish: "MdAG April 2009"). "MdAG"
appear to be the initials for "Maria de los Angeles Gonzalez."
The attached spreadsheet contained rows of bond trades and
columns reflecting, in addition to the trading prices,
commissions. Next to the column reflecting these commissions was
a column entitled "MdAG." That column reflected a total of
$31,875.00.

        b.    Also on or about May 21, 2009, HURTADO sent
from the Hurtado Gmail Account another email to GONZALEZ at the
Gonzalez Yahoo Account, with a "cc" to CC-1. The subject line
stated "mayo" (translated from Spanish: "May"). Attached to the
email was a spreadsheet entitled "MdAG Mayo 2009.xls" (translated
from Spanish: "MdAG May 2009"). The attached spreadsheet
contained rows of bond trades and columns reflecting, in addition
to the trading prices, commissions. Next to the column
reflecting these commissions was a column entitled "MdAG." That
column reflected a total of $509,250.

        c.    On or about June 23, 2009, HURTADO sent from
the Hurtado Gmail account an email to GONZALEZ at the Gonzalez
Yahoo Account. The subject line stated "Cuadro Junio"
(translated from Spanish: "June Graph"). The email stated
(translated from Spanish):

Here I am sending you the graph for June.

Please review everything, let me know of any remarks. I
reviewed everything and it is very good.

I hope we continue this way and improve every day.

Kiss

AH

Attached to the email was a spreadsheet entitled
"junio_incentivo-mary.xls" (translated from Spanish: "June

-17-

Incentive"). The attached spreadsheet contained rows of bond
trades and columns reflecting, in addition to the trading prices,
commissions. Next to the column reflecting these commissions was
a column entitled "Mary." That column reflected a total of
$941,366.80.

        d.    On or about July 28, 2009, HURTADO sent from
the Hurtado Gmail Account an email to GONZALEZ at the Gonzalez
Yahoo Account. The subject line stated "incentivo j[u]lio"
(translated from Spanish: "July incentives"). The email stated
(translated from Spanish):

    I am sending you here the graph for July

    Forgive me for the delay, tomas [CLARKE] had already sent it
    to me.

    Kisses

    Alejandro Hurtado

Attached to the email was a spreadsheet entitled "Mary Julio
09.xlsx." The attached spreadsheet contained rows of bond trades
and columns reflecting, in addition to the trading prices,
commissions. Next to the column reflecting these commissions was
a column entitled "Mary." That column reflected a total of
$233,550.

        e.    On or about February 8, 2010, HURTADO sent an
email from the Hurtado Gmail Account to GONZALEZ at a Gmail
account used by GONZALEZ (the "Gonzalez Gmail Account"). The
email stated (translated from Spanish):

    Dear Mary

    As I promised, here are the numbers to date of what has been
    done.

    Please review and later we will talk on the phone.

    Greetings

    AH

Attached to the email was a spreadsheet entitled "MARY cuadro
Enero-Febrero 2010.xls" (translated from Spanish: "Mary statement
January-February 2010"). The attached spreadsheet contained rows
of bond trades and columns reflecting, in addition to the trading

-18-

prices, commissions.  Next to the commissions column was a column
entitled "Mary."  That column reflected a total of $5,260,439.

      f.  On October 20, 2010, HURTADO sent from the
Hurtado Gmail Account an email to GONZALEZ at the Gonzalez Gmail
Account.  Attached to the email was a spreadsheet setting forth
possible bond transactions that the Broker-Dealer could execute
for BANDES.  The subject line of the email stated:  "Escenario
ELCR" (translated from Spanish:  "ELCR Scenario").  HURTADO's
email stated, in part (translated from Spanish):

> Here's the Elecr [sic] scenario

>     Please look it over, like I said it could be fast and
> very efficient.

>     If you look it over you will be able to see how great
> it would be to do it.

The attached spreadsheet set forth two possible transactions
involving "Elecar" bonds.  The spreadsheet included a column
entitled "Economista" with dollar figures – $7,890,000 and
$6,575,000, respectively – for each transaction.

### HURTADO's Payments to GONZALEZ and to the Gonzalez Company

      33.  Based in part upon my review of documents obtained
from the Broker-Dealer, I have learned, in substance and in part,
that Hurtado's Spouse and HURTADO were heavily compensated by the
Broker-Dealer as follows:

      a.  From in or around January 2009 through
in or around July 2009, Hurtado's Spouse, a Venezuelan national
residing in Florida, was paid commissions by the Broker-Dealer as
a "foreign finder."  Specifically, from in or around April 2009
through in or around July 2009, the Broker-Dealer paid Hurtado's
Spouse approximately $8 million in purported foreign finder's
fees in connection with BANDES trades.

      b.  In or around July and August 2009, the
Broker-Dealer stopped paying Hurtado's Spouse as a foreign
finder.  At or around this same time, ALEJANDRO HURTADO, the
defendant, became an employee of the Broker-Dealer.

      c.  HURTADO was not a licensed broker or trader
in the United States.  Nevertheless, according to payroll
records, in 2010, HURTADO's first full year of employment at the
Broker-Dealer, HURTADO was one of the highest compensated

-19-

employees at the Broker-Dealer, receiving approximately
$4,384,616 in salary and bonus.

34.    Based in part upon my review of financial records
I have reviewed during this investigation, I have learned, in
substance and in part, that ALEJANDRO HURTADO, the defendant,
made payments to MARIA GONZALEZ, the defendant, and the Gonzalez
Company.  Specifically, I have learned the following:

a.    On or about May 28, 2009, a check for
approximately $3,747 that was signed by HURTADO and drawn on a
bank account controlled by HURTADO and Hurtado's Spouse, was
deposited into a bank account held by GONZALEZ in Miami, Florida
(the "Miami Gonzalez Account").  The memo line of the check
stated "April comm."

b.    On or about July 21, 2009, HURTADO wired
approximately $509,250 from an account in the United States held
jointly by HURTADO and Hurtado's Spouse.  These funds were wired
to a correspondent bank account in New York, New York for further
transfer to an account in Switzerland held in the name of
Associate 1.  As described above, Associate 1 was a co-owner of
the Gonzalez Company with GONZALEZ.

c.    On or about September 1, 2009, HURTADO wired
approximately $45,000 from an account in the United States to the
Miami Gonzalez Account.

d.    On or about January 25, 2010, a check for
approximately $20,000 that was drawn on an account held in the
name of HURTADO was deposited into the Miami Gonzalez Account.
The check was made payable to "Maria de los Angeles Gonzalez,"
with the memo line reading "LOAN." GONZALEZ's signature, which I
have compared to another document signed by her, appears on the
back of this check as that of the endorser.

e.    On or about February 13, 2010, a check for
approximately $98,750 that was drawn on a bank account held in
the name of HURTADO was deposited into the Miami Gonzalez
Account.  The check was made payable to "Maria de los Angeles
Gonzalez," with the memo line reading "loan Mary."

35.    In connection with the approximately $509,250 that
ALEJANDRO HURTADO, the defendant, wired to an account held in the
name of Associate 1 on or about July 21, 2009, described above in
sub-paragraph 34(b), I have reviewed an email indicating that
MARIA GONZALEZ, the defendant, directed HURTADO to wire these
funds to the account held in Associate 1's name.  Specifically,

-20-

on or about July 13, 2009, an email was sent from the Gonzalez
Yahoo Account to the Hurtado Gmail Account directing that HURTADO
transfer $509,250 to the account held in the name of Associate 1
in Switzerland through an account in New York.   The email is
signed: "Maria de Los Angeles Gonzalez."

## HURTADO REQUESTED GONZALEZ TO PAY
## HIS TAX LIABILITY FOR KICKBACKS TO HER

36.   Based on the following, I believe that ALEJANDRO
HURTADO, the defendant, requested that MARIA GONZALEZ, the
defendant, send to HURTADO funds sufficient to cover HURTADO's
tax liability for purported income he had received from the
Broker-Dealer that he passed on to GONZALEZ as kickback payments:

a.   On or about August 13, 2010, HURTADO sent an
email from the Hurtado Gmail Account to the Gonzalez Gmail
Account.   The email stated (translated from Spanish):   "Please
review the attachments.   I will await your comments and
revisions."

b.   Attached to the email was a document entitled
(translated from Spanish): "Transactions: 2009/2010."   The
document contained columns labeled (translated from Spanish):
"Month," "Amount," and "Item."

i.   Listed for April is the amount
$31,875.00.   This amount is identical to the amount referenced in
the "MdAG Abril 2009" spreadsheet referenced above in sub-
paragraph 32(a).

ii.   Listed for May is the amount
$509,250.00.   This amount is identical to the amount referenced
in the "MdAG Mayo 2009" spreadsheet referenced above in sub-
paragraph 32(b).   This amount is also identical to the amount
transferred on or about July 21, 2009 to Associate 1 as described
above in sub-paragraph 34(b).

iii.   Listed for June is the amount
$941,366.80.   This amount is identical to the amount referenced
in the "junio_incentivo-mary" spreadsheet referenced above in
sub-paragraph 32(c).

c.   The attached document referenced a subtotal
of $2,028,541.80.   It further referenced a "Tax Bracket" of "35%"
and a total of $709,989.63 for "Reinbursment [sic] Tax."

-21-

d.    Also attached to this email was a typed bank
transfer instruction to wire $709,989.63, the above-referenced
tax-reimbursement amount, from an account held in the name of the
Gonzalez Company to an account in Switzerland held in the name of
a entity affiliated with HURTADO (the "Hurtado Company").    This
wire instruction included a signature line for GONZALEZ to sign
on behalf of the Gonzalez Company.

e.    On or about August 14, 2010, the following
day, a reply to the above email was sent from the Gonzalez Gmail
Account to the Hurtado Gmail Account.    The email stated, in part
(translated from Spanish):

> Here are all the instructions, it seemed to me that
> everything is ok. Now I understand your bad mood when you
> spoke to the accountant from the shock you nearly fell and
> cracked your ribs, with those taxes anyone would have had a
> heart attack. That Uncle Sam is baaaaaad.  You work and he
> charges.  He makes you crazy.

f.    I have reviewed bank records indicating that
several days later, on or about August 19, 2010, $709,989.63 was,
in fact, transferred from the Gonzalez Company account to the
Hurtado Company Account, as referenced in the transfer
instruction that HURTADO had sent GONZALEZ.

## CLARKE MADE PAYMENTS TO GONZALEZ AND TO THE GONZALEZ COMPANY

37.    My review of documents obtained during the course
of the investigation reveals that TOMAS CLARKE, the defendant,
also routed payments to MARIA GONZALEZ, the defendant.    CLARKE
utilized a Panamanian company he controlled, ETC Investments[4] to
direct certain of these payments to GONZALEZ.

38.    My review of documents obtained from the Broker-
Dealer and other financial records reveals the following:

a.    TOMAS CLARKE, the defendant, joined the
Broker-Dealer in or around late 2008 and served as a Senior Vice
President in the GMG.    In CLARKE's capacity as Senior Vice

---

[4] Based on email and real estate records I have reviewed, it
appears that TOMAS CLARKE's wife's first name begins with "E.", and
thus "ETC Investments" bears the combined initials of CLARKE's
wife's first name and the name "Thomas Clarke".    Other evidence
that CLARKE controls ETC Investments is set forth below.

President in the GMG, CLARKE participated in the Broker-Dealer's
business involving BANDES.

      b.  Over the course of the Broker-Dealer's
relationship with BANDES, the Broker-Dealer paid several million
dollars in purported finder's fees to both a Panamanian resident
("Associate 2") and a Panamanian Company, ETC Investments, of
which Associate 2 was designated as president, including the
following:

      i.  On or about September 29, 2009, the
Broker-Dealer in New York, New York, sent two wire transfers in
the amounts of approximately $2,002,983 and $2,048,206,
respectively, to an account held by ETC Investments in
Switzerland.

      ii.  On or about January 21, 2010, the
Broker-Dealer issued two checks in the amounts of approximately
$2,829,585 and $1,920,531 to ETC Investments.  These checks were
issued from the Broker-Dealer in New York, New York, and, as
reflected on stamps appearing on the back of the checks, were
deposited into a Swiss bank.

      iii. On or about May 4, 2010, the Broker-
Dealer in New York, New York, issued a check for approximately
$2,500,000 to Associate 2.

      iv.  On or about May 18, 2010, this check was
deposited into an ETC Investments account in Switzerland.

      39.  Notwithstanding Associate 2's designation as
"president" of ETC Investments, I believe that TOMAS CLARKE, the
defendant, had actual control of ETC Investments based on the
following:

      a.  I have reviewed documents reflecting that
CLARKE maintained a power of attorney for ETC Investments.

      b.  I have reviewed correspondence
between CLARKE and another individual ("Associate 3"),
demonstrating CLARKE's efforts to open a bank or brokerage
account in the name of ETC Investments.

      c.  As described above, the initials "ETC" are a
combination of CLARKE's wife's first name and the name "Thomas
Clarke".

-23-

40.   Based on documents I have reviewed, I also believe that TOMAS CLARKE, the defendant, made payments to the Gonzalez Company through ETC Investments.  For example, I have learned that:

a.   On or about April 13, 2010, April 30, 2010, and August 4, 2010, Associate 3 sent emails to CLARKE attaching instructions requiring a signature to authorize transfers from ETC Investments to a Gonzalez Company account in Switzerland.  These transfer instructions were in the amounts of $833,488.30, $700,000, and $900,000, and were described in the instructions as loans.

b.   At least two of the transfers identified above in subparagraph 40(a) took place.  Specifically, I have reviewed bank records reflecting the following:

i.   On or about April 19, 2010, approximately $883,488 was wired from an ETC Investments account in Switzerland to a Gonzalez Company account in Switzerland.

ii.   On or about May 6, 2010, approximately $700,000 was wired from an ETC Investments account in Switzerland to a Gonzalez Company account in Switzerland.

c.   On or about May 24, 2010, Associate 3 sent an email to CLARKE attaching for CLARKE's signature an authorization to transfer $1,550,000 from an ETC Investments account to another account held at the same Swiss bank (the "Intermediary Swiss Account").  Then, on or about June 4, 2010, bank records reflect that $1,550,000 was transferred from the Intermediary Swiss Account to a Gonzalez Company account in Switzerland.

## GONZALEZ RECEIVED AT LEAST $3.6 MILLION IN KICKBACKS

41.   Documents I have reviewed indicate that MARIA GONZALEZ, the defendant, received at least $3.6 million in kickbacks.  The documents I am relying on include the following:

a.   The document ALEJANDRO HURTADO, the defendant, emailed to GONZALEZ on or about August 13, 2010, described above in paragraph 36, in connection with HURTADO's tax liability, in which HURTADO referenced a sub-total of $2,028,541.80 that had been sent to GONZALEZ; and

b.   Records, described above in sub-paragraph 40(b) reflecting that (i) $883,488 was wired from ETC Investments to the Gonzalez Company on or about April 19, 2010, and (ii)

-24-

$700,000 was wired from ETC Investments to the Gonzalez Company on or about May 6, 2010.

### GONZALEZ RECEIVED FUNDS IN A PERSONAL ACCOUNT IN THE UNITED STATES FROM GONZALEZ COMPANY ACCOUNTS OVERSEAS

42.   I have reviewed bank records for the Miami Gonzalez Account.   These records reflect that MARIA GONZALEZ, the defendant, received funds into the Miami Gonzalez Account that were transferred from accounts outside of the United States held by the Gonzalez Company.   For example:

a.   On or about May 8, 2009, GONZALEZ received into the Miami Gonzalez Account approximately $42,000 that had been transferred from an account held in the name of the Gonzalez Company in Switzerland.

b.   On or about November 9, 2010, GONZALEZ received into the Miami Gonzalez Account approximately $72,610 that had been transferred from an account held in the name of the Gonzalez Company in Switzerland.

c.   On or about September 14, 2011, GONZALEZ received into the Miami Gonzalez Account approximately $42,600 that was transferred from an account held in the name of the Gonzalez Company in Switzerland.

WHEREFORE, deponent prays that warrants be issued for the arrests of the above-named individuals and that they be arrested and imprisoned, or bailed, as the case may be.

Lilian Perez
Special Agent
Federal Bureau of Investigation


Sworn to before me this
/7th day of March, 2013

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

RONALD L. ELLIS
United States Magistrate Judge
Southern District of New York

-25-