**Return Date: December 2, 2014 at 10:00 A.M.**
**Deadline for Filing Objections: November 24, 2014**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

In re:

DIRECT ACCESS GROUP, LLC,

     Debtor.

_____

      Chapter 11 Bankruptcy

      Case No. 13-11780 (ALG)

**MOTION FOR LEAVE TO FILE PROOF OF CLAIM**
<u>**AND MEMORANDUM OF LAW IN SUPPORT**</u>

Respectfully submitted,

**Gomm & Smith**
Rodney Quinn Smith
Katherine A. Sanoja
175 S.W. 7th Street, Suite 2110
Miami, Florida 33130
Tel:(305) 856-7723
Fax:(786) 220-8256

*Attorneys for Claimant, BANDES*

## TABLE OF CONTENTS

Table of Authorities ................................................................................................................ iii

Introduction ......................................................................................................................... 1

Factual Background ............................................................................................................. 2

Memorandum in Support ..................................................................................................... 7

   I.   DAG Should Have Provided BANDES Actual Notice ....................................................... 7

      A.   BANDES is a Known Creditor ................................................................................ 8

      B.   BANDES' Identity as a Creditor Was Reasonably Ascertainable ............................. 10

   II.   DAG's Notice by Publication Failed to Comply with Rules 1005 and 2002(n) of the Federal Rules of Bankruptcy Procedure ................................................................................. 11

   III.   BANDES Failure to Act was the Result of Excusable Neglect ..................................... 13

      A.   DAG Will Suffer Little to No Prejudice ..................................................................... 14

      B.   The Delay Will Not Adversely Impact These Proceedings ........................................ 15

      C.   The Delay Was Caused by the Debtor's Own Actions and Was Not Within Reasonable Control of BANDES ............................................................................................. 16

      D.   BANDES is Acting in Good Faith ............................................................................. 16

   IV.   In the Alternative, the Proof of Claim Filed by SEC Should be Considered an  Informal Proof of Claim Filed on Behalf of BANDES ......................................................................... 17

Conclusion ......................................................................................................................... 18

TABLE OF AUTHORITIES

## CASES

*Alderwoods Group, Inc. v. Garcia*, 420 B.R. 609, 617 (Bankr. S.D. Fla. 2009)..........................11

*In re BGI, Inc.*, 476 B.R. 812 (Bankr. S.D.N.Y. 2012) .................................................................7

*In re Brooklyn Hosp. Ctr. & Caledonian Health Ctr. Inc.,* 513 B.R. 810 (Bankr. E.D.N.Y. 2014) ......................................................................................................................................................12

*In re Drexel Burnham Lambert Group,* 151 B.R. 674 (Bankr. S.D.N.Y. 1993). ..........................7

*In re Enron Creditors Recov. Corp.*, 370 B.R. 90 (Bankr. S.D.N.Y. 2007). ......................... 13, 16

*In Re Houbigant, Inc.*, 190 B.R. 185 (Bankr. S.D.N.Y. 1995) ....................................................17

*In re Keene Corp.*, 188 B.R. 903 (S.D.N.Y. Bankr. 1995) ...........................................................14

*In re R.H. Macy & Co.*, 161 B.R. 355 (Bankr. S.D.N.Y. 1993) ...................................................13

*In re Rockville Orthopedic Assocs., P.C.,* 365 B.R. 366 (Bankr. D. Conn. 2007) ......................17

*In re Thomson McKinnon Secur., Inc.,* 130 B.R. 717 (Bankr. S.D.N.Y 1991). ...........................11

*New York v. New York N.H & H.R. Co.,* 344 U.S. 293 (1953). .......................................................7

*Pioneer Inv. Servs. Co. v. Brunswick Associates L.P.*, 507 U.S. 380 (1993). ..............................13

*See DePippo v. Kmart Corp,* 335 B.R. 290 (Bankr. S.D.N.Y. 2005)..............................................8

*See e.g. In re XO Communs,* Inc., 301 B.R. 782 (Bankr. S.D.N.Y. 2003). ........................ 7, 8, 13

*See In re Enron Corp.,* No. 01-16034, 2003 Bankr. LEXIS 2113, *18 (Bankr. S.D.N.Y. 2003). 14

## OTHER AUTHORITIES

11 U.S.C. §102(1)(A).....................................................................................................................11

Bankruptcy Rule 2002 ............................................................................................................ 11, 12

Bankruptcy Rule 1005 ............................................................................................................ 11, 12

Pursuant to Federal Rules of Bankruptcy Procedure 9006(b) and 3003(c)(3), Banco de Desarrollo Económico y Social de Venezuela ("BANDES"), by and through its undersigned counsel, moves this Court for leave to file its Proof of Claim and in support thereof states as follows:

## INTRODUCTION

The bankruptcy process should not be a means to escape notifying the debtor's largest creditor that happens to be in a different country. But the present case goes beyond this simple truism. Not only has Direct Access Group, LLC ("DAG") failed to notify BANDES of the present bankruptcy, it has done so knowing full well that its former CEO and founder; wholly owned subsidiary, Direct Access Partners ("DAP"); employees of DAP; and according to DAP, DAG's own auditors participated in a scheme to perpetrate a massive multi-million dollar fraudulent scheme at the expense of BANDES.

BANDES now seeks to rightfully recover those commission fees that were fraudulently taken from it. As the facts below will demonstrate, DAG and DAP were keenly aware that BANDES was the main victim of this fraudulent scheme and as such would seek to recover those fraudulently obtained amounts. Stated simply, DAG had full knowledge that BANDES was a known creditor and owed actual notice of this case.

Despite this knowledge, DAG tried a half-hearted attempt at service by publication that more than contributes to any excusable neglect that could unnecessarily be attributed to BANDES. Although BANDES did not receive notice sufficient to require this Court to analyze the four factors of excusable neglect, a prior proof of claim filed by the SEC further protects BANDES's right to now submit its proof of claim.

1

## FACTUAL BACKGROUND

1.      BANDES is a Venezuelan state-owned banking entity founded in 2001 that primarily acts as Venezuela's financial agent in financing economic development projects.

2.      Direct Access Partners, LLC ("DAP") is a New York limited liability company formed in 2002. DAP is a registered broker-dealer with the SEC, NYSE, and NASDAQ and a member of the Financial Industry Regulatory Authority, Inc. ("FINRA").

3.      Direct Access Group, LLC ("DAG" or "Debtor") owns a 99% membership interest in DAP, which is DAG's primary asset [D.E. 111 at ¶5]. As a holding company, DAG has no operations of its own. *See id.* DAP and DAG were both co-founded by Benito Chinea ("Chinea"), who also served as CEO for both companies. *See* **Ex. A**, a true and correct copy of Chinea's executive profile published in Businessweek.

4.      Chinea formed DAP's Global Markets Group ("DAP Global") as an internal division of DAP that offered fixed income trade execution services and generated a commission by marking up the bond purchases and marking down the bond sales in riskless principal transactions. *See* **Ex. B** at ¶¶ 2-3, a true and correct copy of the SEC Amended Complaint filed on April 28, 2014.

5.      In October 2008, DAP Global sought and acquired BANDES as a client. DAP secured this relationship illegally through bribes and a kickback scheme involving at least one BANDES official, Maria de los Ángeles González de Hernandez ("Gonzalez"), VP of Finance for BANDES, and various individuals working for or otherwise affiliated with DAP and DAG. *See id.*

6.      These individuals included Chinea, former CEO of DAP and DAG; Tomas Alberto Clarke Bethancourt ("Clarke"); Joseph Flores DeMeneses ("DeMeneses"); Ernesto Lujan ("Lujan"); Jose Alejandro Hurtado ("Hurtado"); Haydee Leticia Pabon ("Pabon"); and Iuri

Rodolfo Bethancourt ("Bethancourt"). Chinea directly hired Clarke, DeMeneses and Lujan to run DAP Global. *See id*. Bethancourt acted as an intermediary for DAP, receiving not less than $20 million over the course of the scheme. *See id.* at ¶21. In addition, DAP hired Hurtado as a "back office" employee and paid him not less than $6 million through the scheme, and Pabon received payments of approximately $8.6 million in alleged foreign finder fees from DAP. *See id.* at ¶¶ 22-23.

7.      Between at least January 2009 and June 2010, Chinea and the above-mentioned individuals acted in concert with Gonzalez to run this fraudulent scheme, which generated more than $66 million in commission revenues from the trade executions carried out on behalf of BANDES *See id.* at ¶33**;** *see also* **Ex. C,** a true and correct copy of the Complaint filed by DAP against its Auditors on March 27, 2014. Later DAP adopted these same arguments, alleging their truth in DAP's lawsuit against its auditors. *See* **Ex. C**.

8.      Unbeknownst to BANDES, DAG and DAP employees heavily manipulated the bond prices in order to generate unprecedented, high commissions on the trades executed. *See* **Ex. B** at ¶¶32-33. Gonzalez, and possibly other BANDES employees, also destroyed documents and tried to cover their traces within BANDES. DAP's commission revenues more than doubled from the previous year once BANDES joined DAG's client roster. *See* **Ex. C** at ¶ 26. In total, revenue generated as a result of trades executed on behalf of BANDES amounted to approximately 90% of the total revenue generated by DAP's Global Market Group, which equaled approximately 70% of the total commission revenues DAP reported for the time period during which DAP employees were carrying out their scheme. *See* **Ex. B** at ¶ 33; **Ex. C** at ¶26.

9.      In early May 2013, the U.S. Securities and Exchange Commission ("SEC") and the Department of Justice ("DOJ") filed civil and criminal complaints respectively,[1] charging several individuals, primarily employees of DAP, with violations of securities laws and various federal criminal laws, including the Foreign Corruption Practices Act ("FCPA"). In addition, Gonzalez was criminally charged and arrested on May 3, 2013, in connection with the bribery scheme. *See* **Ex. D**, a true and correct copy of the related DOJ press release issued on August 30, 2013.

10.     Separately, DAG conducted its own internal investigation based on the facts and circumstances alleged by the SEC and DOJ, and found that in addition to the employees that the DOJ had singled out, several other employees and officers were involved. Mainly, DAG found that Chinea; James Craig ("Craig"), former Chairman of DAP; DeMeneses; and Brian Pfeffer ("Pfeffer"), DAP's Chief Compliance Officer, "participated in or otherwise consciously avoided knowing" or "were unjustly enriched" by the scheme [D.E. 111 at ¶9].

11.     On or around August 2013, Lujan, Hurtado, and Clarke plead guilty to the criminal charges. *See* **Ex. D**. A few months later, Gonzalez plead guilty to five counts, including one count of conspiracy to commit money laundering and violation of the Travel Act, two counts of money laundering and two counts of violation of the Travel Act, all of which arose from the scheme involving BANDES. *See* **Ex. E**, a true and correct copy of the related DOJ press release issued on November 18, 2013.

12.     Shortly after the SEC and DOJ filed their complaints against these individuals, DAP's parent company, DAG, filed an involuntary bankruptcy proceeding under Chapter 7 of the Bankruptcy Code [D.E. 1]. The Chapter 7 bankruptcy was filed only a few weeks after

---

[1] *See* Complaint filed in *SEC v. Clarke Bethancourt, et. al.*, Case No. 13-cv-03074 (SDNY); *see also,* DOJ Complaints in Cases No. 14-CR-240; No. 13-CR-901.

Goldman Sachs, DAP's primary clearing firm, ceased clearing trades placed by DAP's customers. *See* **Ex. C** at ¶134. As a result, DAP shut down its operations in May 2013. *See id.*

13.     BANDES was not a party or otherwise involved in any of the civil or criminal proceedings.

14.     After DAG's management resigned as managing members on July 21, 2013, they appointed William Henrich as the sole managing member of DAG [D.E 111 at ¶3]. On July 22, 2013, DAG filed a voluntary petition under Chapter 11 of the Bankruptcy Code [D.E. 19].

15.     On November 12, 2013, this Court issued an order establishing the deadlines for filing proof of claims, setting the deadline of December 20, 2013 for general creditors and January 20, 2014 as the deadline for any governmental units [D.E. 79].

16.     DAG did not provide BANDES actual notice of these bankruptcy proceedings or notice of the Bar Date for filing proofs of claim. BANDES was otherwise unaware of these proceedings prior to the expiration of the Bar Date.

17.     On November 25, 2013, the Debtor filed an affidavit of the publication notice [D.E 87]. According to the affidavit, the notice of deadlines for filing proofs of claim was published in the Wall Street Journal, "a daily national newspaper of general circulation throughout the United States," on November 20, 2013. The publication notice contained the name of the debtor Direct Access Group, LLC, but failed to include any other identifying information such as a federal tax-payer ID number or reference to its wholly owned subsidiary, DAP.

18.     On January 17, 2014, the SEC filed a proof of claim in these bankruptcy proceedings [Claim 26-1], based on an ongoing investigation by the SEC "into certain pre-bankruptcy transactions and practices involving Direct Access Group ("DAP") and its fully

owned subsidiary Direct Access Partners, LLC ("DAP"), which may have transferred funds obtained in violation of federal securities laws to DAG." *See* Attachment A, Claim 26-1.

19.    On March 27, 2014, DAP filed a complaint against its auditor, Rothstein, Kass & Co., P.C., for failure to perform its duties as an auditor under Generally Accepted Accounting Principles ("GAAP"). *See* **Ex C**. DAP adopted most of the facts and allegations contained in the SEC and DOJ complaints and further alleged that Rothstein should have discovered the $66 million dollar bribery and kickback scheme that DAP employees carried out against BANDES. *See* **Ex. C** at ¶45. In addition, DAP commenced FINRA arbitration proceedings against its former employees, Chinea, Craig, DeMeneses and Pfeffer claiming "an amount no less than $31,000,000" in damages [D.E. 111 at ¶¶14-15].

20.    DAP and DAG settled their claims against former employee Pfeffer, as evidenced in this Court's records [D.E. 117].

21.    In April 2014, the SEC charged former DAP officers, Chinea and DeMeneses, with securities law violations connected with trades executed on behalf of BANDES. *See* **Ex. F**. Chinea was also the CEO and co-founder of DAG. *See* **Ex. A.** In addition, the Department of Justice criminally charged Chinea and DeMeneses with conspiracy, money laundering, violations of Foreign Corrupt Practices Act ("FCPA") and the Travel Act. *See* **Ex. G**, a true and correct copy of the press release issued by the DOJ on April 14, 2014.

22.    The civil and criminal complaints brought against the individuals above describe a brazen scheme that caused BANDES to lose tens of millions of dollars. According to the SEC's Second Amended Complaint, not only was DAP involved in making payments in furtherance of the scheme, but DAG also received funds and/or made payments to at least some of the individuals participating in the scheme. *See* **Ex. B** at ¶¶75, 117(e).

23.     DAP represents approximately 64% of the total assets that DAG has disclosed in these proceedings [D.E. 27, Schedule B]. In addition, DAG has listed as an asset, a loan receivable in the amount of $854,500. *See id*. This loan receivable is from DeMeneses, one of the former executives of DAP involved in carrying out the fraud against BANDES. *See* **Ex. B**. In other words, the majority of DAG's assets and revenues originated from DAP's operations, which included the above described fraudulent scheme.

### MEMORANDUM IN SUPPORT

### I.     DAG Should Have Provided BANDES Actual Notice

Pursuant to the Due Process Clause in the Fifth Amendment of the United States Constitution, debtors must provide notice of the filing of the bankruptcy case and the bar date in order to afford creditors the opportunity to file a proof of claim. *See e.g. In re XO Communs, Inc.*, 301 B.R. 782, 791 (Bankr. S.D.N.Y. 2003). Debtors must afford creditors with notice "reasonably calculated, under all the circumstances to apprise them of the pendency of the Bar Date." *See e.g.*, *In re BGI, Inc.*, 476 B.R. 812, 820 (Bankr. S.D.N.Y. 2012). Moreover, courts have consistently held that due process requires that debtors afford *actual* notice of the bar date to *known* creditors. *See e.g., New York v. New York N.H & H.R. Co.,* 344 U.S. 293, 296-297 (1953). Courts treat notice under Chapter 11 cases differently because the bar date is not set by the Federal Rules of Bankruptcy Procedure, therefore placing the burden on the Chapter 11 debtor to cause formal notice to be given. *See e.g.*, *In re XO Communs., Inc.,* 301 B.R. at fn 5. In other words, debtors have the obligation to give known creditors a higher level of notice, not just constructive notice.

"Known creditors are defined as creditors that a debtor knew of, or should have known of, when serving notice of the bar date." *See e.g., In re Drexel Burnham Lambert Group,* 151 B.R. 674, 681 (Bankr. S.D.N.Y. 1993). On the other hand, "a creditor is unknown if their

7

interests are either conjectural or future . . . or do not in due course of business come to knowledge [if the the debtor]." *See DePippo v. Kmart Corp¸* 335 B.R. 290, 296 (Bankr. S.D.N.Y. 2005). "A known creditor includes both a claimant whose identity is actually known to the debtor or a claimant whose identity is 'reasonably ascertainable' by the debtor." *See In re XO, Communs Inc.,* 301 B.R. at 793. Moreover, "a known claim arises from facts that would alert the reasonable debtor to the possibility that a claim might reasonably be filed against it." *See id.* at 794 (citing *In re Drexel Burnham Lambert Group*, 151 B.R. at 681).

While a debtor is not required to conduct an impracticable and extensive search to identify creditors, it is required to undertake reasonably diligent efforts to uncover the identity of the creditor. *See id.* at 793. These reasonable diligent efforts will "vary in different contexts and may depend on the nature of the property interest held by the debtor." *See id.* The Second Circuit has consistently held that the necessary search requires a careful examination of the debtor's own books and records. *See id.*

A.      BANDES is a Known Creditor

Make no mistake, DAG filed for bankruptcy precisely because the SEC uncovered the massive fraudulent scheme involving DAP's execution of trades for BANDES. This fraudulent scheme, according to DAP's own filings, generated over $74 million in commission revenues, of which approximately 90% or roughly $66 million were attributable to trades executed for BANDES. *See* **Ex. C** at ¶26. It is beyond belief that DAG would never expect BANDES to seek reimbursement of the commission fees fraudulently taken from it.

Moreover, DAG has recognized the possibility of a claim by BANDES. By suing its auditors, executives, and employees, DAP has essentially admitted that it engaged in fraudulent activities. DAP can have no claim against these defendants unless the scheme actually took

place. And if DAP perpetrated a fraudulent scheme, then it had to be reasonably ascertainable that BANDES would also one day take the same steps that DAP is currently taking—bringing a claim to recover BANDES's money. As DAG has already admitted, DAP is fundamental to DAG's ability to resolve its Chapter 11 claims [D.E. 111 at ¶5]. Stated simply, DAG's own actions show that BANDES is a known creditor.

In addition, there can be no argument that DAG somehow lacked the ability to conceive of BANDES as a known creditor. The highest-level executives and owners of DAG knew of the scheme. In early May 2013, the SEC charged several employees of DAP as a result of the fraud, and in April 2014 the SEC charged two additional employees also involved, including Benito Chinea, the former CEO of DAP and DAG. DAG was not a large company with thousands of employees such that this fraud could fall through the cracks. DAG was a closely held entity whose owners and executives were charged with fraud and violation of various federal criminal laws. Those individuals should have known that BANDES would seek to recoup its losses, and any knowledge they had would be imputed to DAG.

Any alleged separation of the entities would not provide relief to the actual notice requirement. As the parent company of DAP, DAG knew that BANDES was the primary victim of the fraudulent scheme. All of the profits not otherwise spent on operational expenses would have flowed to DAG, which was no trivial amount. The sizeable commission revenue generated from trades performed for BANDES accounted for over half of the revenues earned by DAP, leaving no doubt as to BANDES's existence as DAP's primary customer. DAG received and/or made payments of these commission revenues in furtherance of the kickback scheme involved in trades made for BANDES. DAG therefore knew of BANDES' identity as DAP's main customer and based on the SEC investigation also knew that the fraudulent scheme primarily involved

trades for BANDES. Some of the executives of DAG were also the executives of DAP, taking money from the fraud at both levels of the corporate structure. In other words, individuals at every corporate level knew of the identity of BANDES and the claim for damages that would likely follow.

      B.     <u>BANDES' Identity as a Creditor Was Reasonably Ascertainable</u>

Even though the facts surrounding the fraud show that DAG was aware of the existence of BANDES as a creditor, the circumstances surrounding DAG's filing for bankruptcy and the shut-down of its wholly-owned subsidiary as a result of the scheme further prove that BANDES's identity as a creditor was reasonably ascertainable. DAG did not have to perform an impracticable or extended search in order to identify BANDES' claim. It could have read the *Wall Street Journal*, the SEC Complaint filed against DAP employees, or DAG's own complaints filed against its auditors, executives, and employees. In all of these publications, BANDES was the primary victim of the fraudulent scheme. Moreover, the law requires that DAG perform a reasonable diligent search for creditors. It would be incredulous for DAG to deny that it was not aware of the possibility that BANDES might reasonably file a claim against it. Moreover, DAG's inclusion of the SEC in its schedule of creditors further belies any argument that BANDES' identity as a creditor was unknown [D.E. 27, Schedule E].

The particular circumstances outlined above demonstrate that BANDES is a known creditor. As a known creditor, the applicable law required DAG to provide BANDES actual notice of the bar date, and DAG has never included BANDES as a creditor or made any attempt to notify BANDES of the bankruptcy proceeding. Due to the absence of such notice this Court should allow BANDES to file its proof of claim. A copy of the Proof of Claim BANDES intends to file is attached as **Ex. H**.

## II.    DAG's Notice by Publication Failed to Comply with Rules 1005 and 2002(n) of the Federal Rules of Bankruptcy Procedure

While notice by publication is insufficient for known creditors, courts have held that notice by publication will generally suffice for creditors whose name, addresses and interests are not known to the debtor. *See e.g., In re Thomson McKinnon Secur., Inc.,* 130 B.R. 717, 719 (Bankr. S.D.N.Y 1991). Nevertheless, notice by publication is still subject to the requirements of due process. *See e.g., Mullane v. Central Hannover Bank & Trust Co.,* 339 U.S. 306, 314 (1950). Moreover, while a bankruptcy court order can approve a Notice of Publication, the bankruptcy court's order cannot supersede the requirements of the Bankruptcy Rules. *See Alderwoods Group, Inc. v. Garcia*, 420 B.R. 609, 617 (Bankr. S.D. Fla. 2009).

In Chapter 11 proceedings, §102(1)(A) states that notice means notice that is "appropriate in the particular circumstances," and the Bankruptcy Rules further elaborate under Rule 2002(l), that "the court may order notice by publication if it finds that notice by mail is impracticable . . . ." Moreover, the Bankruptcy Rules 1005 and 2002(n) address the required form of the notice that a debtor must provide to a creditor. Specifically, Rule 1005 states that every caption shall contain the title of the case, and the title of the case shall include the name of the debtor, employer identification number, any other federal taxpayer-identification number, and "all other names used within eight years before filing the petition." Rule 2002(n) further requires that "the caption of *every* notice under this rule *shall* comply with Rule 1005" (emphasis added). Since notice by publication is governed by Rule 2002, such notice must also comply with Rule 1005.

In *Mullane,* the Supreme Court established the standard for evaluating whether a notice by publication is constitutionally sufficient, requiring that the notice must be "reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *See Mullane,* 339 U.S. at 314. Courts

11

in the Second Circuit have adopted the standard announced in *Mullane* in Chapter 11 cases. *See e.g., In re Brooklyn Hosp. Ctr. & Caledonian Health Ctr. Inc.*, 513 B.R. 810, 819 (Bankr. E.D.N.Y. 2014). In bankruptcy cases where the notice does not meet the *Mullane* standard, the creditor's "claim is not subject to the bar date order." *See id.* (citing *Chemetron Corp. v. Jones*, 72 F. 3d 241, 345-346 (3d. Cir. 1995).

The claimant in this case does not dispute the fact that the court approved the form and manner of the publication notice, but the issue is different: was the publication notice constitutionally sufficient under the *Mullane* standard? Even if this Court finds that BANDES was an unknown creditor, the notice of publication as to BANDES failed to satisfy due process and would allow BANDES to now file its proof of claim.

Here, the publication notice was not in accordance with the Bankruptcy Rules nor was it "reasonably calculated" to reach BANDES. First, the notice does not contain any of the required identifiable information, such as a federal identification number, as required by Bankruptcy Rules 2002(n) and 1005. Second, the notice does not contain any reference to DAP, DAG's wholly owned subsidiary, which was the entity that worked directly with BANDES.[2] Third, the notice was published in an American newspaper, with national circulation, which was not intended to reach nor was "reasonably calculated" to reach any foreign creditors such as BANDES. As a result, this Court should find that DAG's notice of publication was not reasonably calculated to apprise BANDES of these proceedings, and because it did not conform to requirements set forth in the Bankruptcy Rules it failed to satisfy the standards of due process as to BANDES. Without due process, BANDES' claim cannot be subject to the Bar Date.

---

[2] The Second Circuit has held that an automatic stay applies to a debtor's wholly-owned subsidiary when a claim against the subsidiary would have a "immediate adverse economic impact" on the debtor. *See Queenie, Ltd. v. Nygard Int'l*, 321 F. 3d 282, 288 (2d. Cir. 2003). Based on this holding, in cases where a claim against the non-debtor would have an adverse impact on the debtor company, it would be imperative to have debtors list their wholly owned subsidiaries in any notice since those subsidiaries would also be subject to the automatic stay.

### III.    BANDES Failure to Act was the Result of Excusable Neglect

Even though BANDES was a known creditor, any decision that BANDES was an unknown creditor adequately notified by publication would not change the result because this Court should use its discretion to enlarge the time to file proofs of claim under Bankruptcy Rule 9006(b)(1). The determination whether a party's neglect of a bar date is excusable is essentially an equitable one, requiring courts to take into "account all relevant circumstances surrounding the party's omission." *See Pioneer Inv. Servs. Co. v. Brunswick Associates L.P.*, 507 U.S. 380, 395 (1993). To aid courts in this determination, the Supreme Court in *Pioneer* identified the following main factors for consideration: "(1) the danger of prejudice to the debtor; (2) the length of the delay and its potential impact on judicial proceedings; (3) the reason for the delay, including whether it was within the reasonable control of the movant; and (4) whether the movant acted in good faith." *See e.g., In re BGI, Inc.* 476 B.R. at 824.

In applying the above *Pioneer* factors, the Second Circuit has focused its analysis by primarily looking at the reason for the delay and whether the delay was in the reasonable control of the movant. *See In re Enron Creditors Recov. Corp.*, 370 B.R. 90, 102 (Bankr. S.D.N.Y. 2007). Nevertheless, not *all* factors need to favor the movant party in order to find excusable neglect. *See In Re XO Communs.*, 301 B.R. at 795. Courts have recognized that "no single circumstance controls . . . [i]nstead, courts are to look for a synergy of several factors that conspire to push the analysis one way or another. *See id.* In addition, case law shows that the above factors are not exclusive, and in some cases courts have considered other additional factors such as the adequacy of the notice provided by the debtor. *See e.g., In re R.H. Macy & Co.*, 161 B.R. 355, 361 (Bankr. S.D.N.Y. 1993). In light of the above, an application of the *Pioneer* factors directs this Court to permit BANDES' proof of claim.

A.    DAG Will Suffer Little to No Prejudice

While the Supreme Court in *Pioneer* did not define "prejudice," courts in the Second

Circuit have looked at various considerations in determining the existence of prejudice,

including:

> (1) the size of the late claim in relation to the estate, (2) whether a
> disclosure statement or plan of reorganization has been filed or
> confirmed with the knowledge of the existence of the claim, and
> (3) the disruptive effect that the late filing would have on the a
> plan close to completion . . . .

*See In re Keene Corp.*, 188 B.R. 903, 910 (Bankr. S.D.N.Y. 1995). Moreover, courts have found

no significant prejudice where there was no disclosure statement or plan of reorganization filed

at the time that the motion is made and where the facts were sufficiently unique that it would not

open up the proceedings to similar late-filed claims. *See In re Enron Corp.,* No. 01-16034, 2003

Bankr. LEXIS 2113, at *18-19 (Bankr. S.D.N.Y. 2003).

In this case, DAG has not yet filed its disclosure statement or plan of reorganization and

this Court has only recently granted the Debtor's third motion to extend the time to file its plan

[D.E. 130]. Considering the number of extensions requested by the Debtor in these proceedings,

it would be hard to argue that the Debtor is further prejudiced by a delay caused by a late proof

of claim. In addition, the facts surrounding BANDES's claim are very unique in relation to other

creditors, preventing the potential opening of a floodgate of similar late-claims. BANDES's

claim involves very specific claims against the Debtor that directly relate to the Debtor's

misconduct and which only impacted one other Venezuelan state-owned bank besides BANDES.

*See* **Ex. B** at ¶7. In other words, BANDES's claim will not invite a deluge of similar claims. In

addition, DAG had advanced knowledge of the claim, which related to the proof of claim already

filed by the SEC, and as such BANDES's claim should cause little to no disruption on the

reorganization.

14

While the size of BANDES's claim is large, this factor alone does not warrant a finding that the motion should be denied. In fact BANDES's claim is critical to this Court's ability to properly determine which assets were obtained as a result of defrauding BANDES and thereby determine all issues regarding dischargeability. This Court should therefore find that this factor falls in favor of allowing BANDES to file its proof claim.

B.    The Delay Will Not Adversely Impact These Proceedings

The second factor outlined in *Pioneer* considers the length of the delay and the impact of that delay on the proceedings. While there is no bright line on determining whether the length of delay is too long, courts in the Second Circuit have looked primarily to whether the delay would disrupt the judicial administration of the case. *See In re Infiltrator Sys.*, 241 B.R. 278, 281 (Bankr. D. Conn. 1999) (Finding that since "the debtor has not yet filed a plan and is still engaged in assessing the validity and amounts of the timely filed claims, the impact upon administration of the case . . . is not significant").

In this case, the claim comes approximately ten (10) months after the Bar Date, but not after a plan or disclosure statement has been filed. In other words, allowing this claim would not affect the success of the reorganization by requiring the returns of amounts paid to other creditors under a confirmed Plan. In addition, DAG has been aware of the nature and extent of BANDES' claim as result of the SEC investigation and subsequent court proceedings against individual employees. As a result, DAG should have reasonably considered the impact this claim would have on the overall reorganization plan.

C.    The Delay Was Caused by the Debtor's Own Actions and Was Not Within Reasonable Control of BANDES

The Second Circuit has identified this factor as the primary consideration in an analysis under the *Pioneer* standard. *See In re Enron Creditors Recov. Corp.*, 370 B.R at 101. In other words, courts have often focused on the circumstances surrounding the delay in order provide adequate context for an ultimate equitable determination of whether there is excusable neglect. *See id.* at 103.

In the facts relevant to this case, BANDES has no offices or employees located within the United States. After the uncovering of the massive fraudulent scheme, BANDES no longer had a business relationship with DAP or DAG. In fact, BANDES was not a party to any other court proceedings in the United States. BANDES is no longer trading bonds through DAP, and has no further communication with DAG or DAP. As such, BANDES had no knowledge that DAG had filed for bankruptcy, nor did it receive notice of the bankruptcy proceedings. Without offices or employees in the United States, there was no reason for BANDES to become aware of the bankruptcy and/or any subsequent notice published in small-font buried in the back of an American newspaper. There was no issue of willful blindness, mistake or carelessness that caused BANDES's delay. As such, the delay caused by the Debtor's own failure to reasonably inform BANDES is not within BANDES' reasonable control. Under the circumstances, BANDES has come forward as soon as practicable to assert its claim. In light of the unique facts present in this case, the Court should find that this factor favors permitting BANDES to file its claim.

D.    BANDES is Acting in Good Faith

Courts in the Second Circuit generally find that this factor weighs in favor of the movant, unless specific facts to the contrary are available on the record. *See e.g., In re Enron Creditors*

*Recovery Corp.*, 370 B.R. 90, 104 (Bankr. S.D.N.Y. 2007). In this case, there are no facts showing that BANDES has acted in bad faith. To the contrary, the only reason BANDES is in this position is due directly as a result of the bad faith actions of DAP/DAG employees and DAG's own failure to notify BANDES of these proceedings.

Based on the application of the factors above, this Court should find that the balance of the equities weights in favor of BANDES and should therefore permit BANDES to file its proof of claim.

**IV.    In the Alternative, the Proof of Claim Filed by SEC Should be Considered an Informal Proof of Claim Filed on Behalf of BANDES**

Courts in the Second Circuit have long recognized the equitable doctrine of informal proof of claim where a formal proof of claim has not been timely filed. *See e.g.*, *In re Rockville Orthopedic Assocs., P.C.*, 365 B.R. 366 (Bankr. D. Conn. 2007). There has been an "especially liberal approach in applying the doctrine of informal proof of claim." *See id.* This doctrine allows a late filed proof of claim to relate back to the time of filing of the informal proof claim, allowing an amendment of that claim or a formal proof of claim to be filed after the Bar Date. *See e.g.*, *In Re Houbigant, Inc.*, 190 B.R. 185, 187 (Bankr. S.D.N.Y. 1995). To qualify under this doctrine, the document purported to be an informal proof of claim must:

> (1) have been timely filed with the bankruptcy court and have become part of the judicial record; (2) state the existence and nature of the debt; (3) state the amount of the claim against the estate, and (4) evidence the creditor's intent to hold the debtor liable of the debt.

*See id.* All four of these factors are present here.

BANDES's claim against DAG is directly related to the subject matter and basis of the SEC proof of claim timely filed on January 17, 2014. The two claims are necessarily interrelated

17

and in fact arise from the same transactions conducted by DAG and DAP involving fraudulent trades performed for BANDES. On January 17, 2014, the SEC timely filed its proof of claim. Since this proof of claim was timely filed it became part of the judicial record in these bankruptcy proceedings. The SEC's proof of claim stated the existence and nature of the claim by describing the disgorgement of profits obtained in violation of federal securities laws. While the exact amount of the claim is not listed on the SEC claim, the nature and extent of the claim, including the circumstances surrounding the fraud require a thorough investigation before ascertaining a precise amount. As to the fourth prong, any amounts that DAP or DAG fraudulently acquired or distributed as a result of trades made for BANDES are amounts that could be included in an SEC claim. BANDES as the main victim of the fraud would be entitled to restitution of any amounts the SEC recovers. In light of the above, BANDES would request that this court consider the SEC's Proof of Claim as an informal proof of claim filed on behalf of BANDES or in the alternative consider BANDES' claim as an amendment to the proof of claim filed by the SEC.

### Conclusion

Based on the foregoing, the claimant requests that this Court Grant its Motion for Leave to File a Proof of Claim and order any other relief this Court deems just and proper.

Dated:  October 29, 2014.

Respectfully submitted,

/s/ Quinn Smith
Rodney Quinn Smith, Fla. Bar No. 59523
*Admitted Pro Hac Vice October 29, 2014*
e-mail: quinn.smith@gommsmith.com
Katherine A. Sanoja, Fla. Bar No. 99137
*Admitted Pro Hac Vice October 29, 2014*

18

e-mail: katherine.sanoja@gommsmith.com
Gomm & Smith
175 S.W. 7th Street, Suite 2110
Miami, Florida 33130
Tel:(305) 856-7723
Fax:(786) 220-8256
*Attorneys for Claimant, BANDES*

## CERTIFICATE OF SERVICE

I hereby certify that, on October 29, 2014, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record and the parties identified below in the manner specified, either via transmission of notices of electronic filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically notices of electronic filing.

/s/ Katherine Sanoja
Katherine A. Sanoja

## Service List

Tracy L. Klestadt (via CM/ECF)
Brendan M. Scott (via CM/ECF)
KLESTADT & WINTERS LLP
tklestadt@klestadt.com
bscott@klestadt.com
*Counsel for Debtor*

Jennifer Sharret (via CM/ECF)
Kramer Levin Naftalis & Frankel LLP
jsharret@kramerlevin.com
*Counsel for Debtor*

Schuyler G. Carroll  (via CM/ECF)
PERKINS COIE LLP
SCarroll@perkinscoie.com
*Attorneys for Creditor Lake Avenue Capital, LLC*

Deborah J Dwyer (via CM/ECF)
NYS Dept. of Taxation and Finance
Deborah.Dwyer@tax.ny.gov
*Creditor*

*Deana Davidian* (via CM/ECF)
Arkin Solbakken, LLP
ddavidian@arkin-law.com
*Counsel for Creditor Neil Feinberg*

Robert Gross (via CM/ECF)
Eaton & Van Winkle, LLP
rgross@evw.com; slapriore@evw.com;
bmarx@evw.com
*Counsel for Interested Party Headwaters Holdings, LLC*

Geoffrey J. Peters (via CM/ECF)
Weltman, Weinberg & Reis Co., LPA
gpeters@weltman.com
*Counsel for Creditor CIT Technology Financing Services, Inc.*

Russell J. Sweeting (via CM/ECF)
Maya Murphy P.C
rsweeting@mayalaw.com
*On behalf of Richard Londono*

United States Trustee (via U.S. Mail for delivery to Clerk's office)
Chambers of Judge Allan L. Gropper (via U.S. Mail to Clerk's office)
U.S. Clerk, Bankruptcy Court S.D.N.Y
One Bowling Green
New York, NY 10004-140

20